Good morning, Your Honors. Terry Gross for the appellants and plaintiffs, Heather and Mark Ewing. This case involves a SWAT team invading the home of an innocent family, arresting the parents for murder and detaining them for a week, despite the fact that they had nothing to do with the underlying crime. First, the district court erred in granting summary judgment for the arrest of Mark for murder. It's undisputed as to the first element of qualified immunity that Mark was arrested without probable cause. But the district court erroneously found for the officers on the second problem of qualified immunity, reasoning based solely on this, that it was the district court said it was undisputed that the deputy district attorney Fleming conveyed his intent to file a criminal complaint against Mark Ewing at the same time that he advised the officers to arrest Mark on murder charges. Does that matter on the officers' qualified immunity? I'm sure it matters. Well, I mean, it no doubt matters on Fleming's absolute immunity claim. Yes. But does the – there's no question, but what he said, go ahead and add. Add book. Add book. Okay. So can't the officers rely on that advice, in part at least? Stevens v. Rose, this Court said that it's only one factor, and in Stevens v. Rose it was a factor that was not sufficient when the, you know, officers should have known that there was no probable cause for any arrest. Here it's the same thing. First, Fleming didn't say I believe there's probable cause. He just said book them for murder. So there isn't even any advice that's given other than that they should be booked for murder. I mean, and secondly, what should be looked at is, I mean, that is one factor, but what these officers, experienced officers with many years of experience, they said themselves, we don't believe there's probable cause, and that all that they had with respect to Mark, and what they said is, we have nothing to tie Mark to this incident, except for the fact that he was married to Heather. That simply is not enough to find. Well, they actually had a little more than that. I mean, they had the fact that somebody heard some name called out that ended with a K sound. Or that may have ended with a K sound. The blue Maglite or whatever it was in his house or in his motorcycle. He was a member of the, the. He was a member. Yes, he was a member. And someone did say he was, they thought he was there, although with only like a 50 or 60 percent. Well, yes, there was a 50 percent, but a witness, Contreras, who had been standing right next to the woman and to Shirk at the incident, and another witness had been shown at the scene DMV photographs of Mark and failed to identify them. So they knew that the people who had been right there didn't identify them. The flashlight that was found. Could they reasonably rely on Fleming? Excuse me? Couldn't they reasonably rely on Fleming? Well, as in Stevens v. Rose indicates, that they can't. That that's one factor that should be looked at, but it's not sufficient, and the officers need to look at what evidence of probable cause was there. And here there really is no evidence that would raise the probable cause that a reasonable officer would believe that there is probable cause. As in fact, these officers said that there was no, they did not believe there was probable cause, and in fact, the city's expert, you know, gave exactly the same opinion. I interrupted you. You were talking about the Maglite. Could you? Oh, yeah. With respect to the Maglite, the Maglite, all that was found, there was, there is a, you know, at the time that they were arrested for murder, there was no evidence whatsoever that there was any blood in the Maglite. That's a misinterpretation of the record. The searcher found the Maglite and didn't say anything that there was blood on the Maglite. And it's only eight days later that there's a paraphrase of that that refers to blood on it. In fact, it turned out much later it was Coca-Cola. Actually, it wasn't even on the Maglite. It was on some other item near the Maglite. But at the time, they had, there was no evidence in the record whatsoever that there was any blood on the Maglite. Turning to Heather, the same thing, the district court similarly erred in finding the officers had qualified immunity to arrest Heather for, you know, for murder. The city below didn't even argue that there was probable cause to arrest Heather. And basically what the district court relied on was saying that there was sufficient evidence to find that Heather played a substantial aiding and abetting role in murder. Well, the undisputed evidence here is completely different. There were only two witnesses who described the woman's activities, Shirk and Contreras. And they both made clear that nothing criminal or aiding and abetting occurred. You know, at this scene, you know, it's night. There's two men who are wearing motorcycle vests who are being surrounded by 15 other men who are threatening them. And basically the victim and some friends, you know, sort of approach and they gather close to see what's happening. And sort of as this altercation swings near them, a woman seeking to get away, you know, bumps into the victim, a 6'5", a man who's described as a hothead, who turns on her and starts yelling profanities, that she's frightened, she calls out for help. Tragically, one of the men comes and ends up knifing this man. But what's the evidence as to what the woman did? Shirk, you know, the one who gave the eyewitness identification, all that he says at his recorded interview is she looked completely harmless. She was trying to keep out of the way. When the fight started moving, she tried to get behind us. She was trying to go for cover and safety. Then, you know, when she pushed behind Mark, he turned around and started yelling at her, and she cowered. She was frightened. He must have spooked her. And that's when she called out, I don't think she meant anything by what she did. Contreras, the only other witness, concurs that she was just stepping away from the problem. Scalia. I mean, if the police had probable cause to arrest on the drug charges, did the adding the murder charge, did that result in any independent probation of liberty? Shirk. Yes, very clearly. Even with, you know, with the potential drug charge, there was eligibility for parole and, you know, which evaporated. Scalia. Parole or bail? Shirk. I'm sorry, for bails. Thank you, Your Honor. Excuse me. There was eligibility for bail. They were, because of this, they were kept away from, you know, from their family, you know, for a week. And moreover, then their pictures were, when they were arrested for murder, their pictures were spread on the front page of the paper, you know, in the community. And, you know, it's still something that's there on their record. And, you know, it's, you know, very clear that the police have to have probable cause for each item that they're arrested for. I mean, if that was sufficient, just, oh, well, they're in jail, let's, that we could book them for something else, then if somebody is in jail for overdue parking tickets, they've been arrested, and then they're, it turns out that they, you know, are similar to some person who's, you know, a description has been given of someone in some other crime, the police could then just add those charges to them. Let's just hold them and see what happens, even though there's no probable cause. That certainly is not what the Constitution requires. Sotomayor, were the police wrong in consulting with the DA? Gershengorn No, they weren't wrong in consulting with the DA. Where they were wrong was in, where they were wrong was in not exercising their independent authority to look at whether there was probable cause to arrest Heather for murder. They knew that there wasn't, and that they also knew that they, the district attorney, didn't have enough evidence to have concluded that. And therefore, as since any reasonable police officer would have known that probable cause was lacking, they should not have arrested them for murder. Turning to the claim of judicial deception, as Your Honor, Judge Reuner, stated in Lombardi v. City of El Cajon in 1997, by reporting less than the total story, an affluent. Ginsburg That's such a rotten trick. Gershengorn It's a standard trick, Your Honor. An affluent can manipulate the inferences that a magistrate will draw, and to allow a magistrate to be misled in such a manner could denude the probable cause requirement of all real meaning. And that's what happened here. Though the district court correctly found that the officer made some affirmative misrepresentations, it then failed to excise all of the misrepresentations and read back in the omissions. Now, there's basically the district court's reasonings of why there was sufficient probable cause go into two different areas, instigation, or aiding and abetting, and the reliability of the ID. And let's look at each separately. As to the instigation, the district court was swayed by a very significant misrepresentation and omissions in the affidavit. As discussed before, Shirk had basically – everything that Shirk said, that the woman was stepping away, that she was frightened, that she, you know, had no such intent, that's completely omitted. And instead, a very significant misrepresentation is in the affidavit, which is the officers put in information that they knew was not true, which was something that had been, you know, a paraphrase of what Shirk had said at the scene. And all that they put in is that Shirk said that the woman attempted to entice the victim and yell for her friends. And then as to this long recorded interview, of which I read you portions of it, it's paraphrased simply and inaccurately as saying that she stepped behind the victim and pushed him very hard. This omits both Shirk and Contreras' observations. If we then also excise the misrepresentation provided that the district court excised about the criminal record and read all of this in, there's no – there's, you know, no way that a magistrate would have found that there was probable cause to believe Heather had engaged in any criminal activity. As to the issue, is it – I mean, the issue is whether there's possibility of finding evidence. It doesn't matter at that point whether they had probable cause to arrest Heather or Mark for drugs or for fighting or for anything. The only question was whether there was possibly evidence or probably evidence found in this. Well, let me – if I may, Your Honor, let me move on to the identification, because I think that's exactly the issue, you know, is whether they would have felt that there was evidence that they should have gone to Heather's house. And I will tell you – I'm going to give you a list of everything that was omitted. Essentially, what was omitted from the affidavit, and if this had been put in, no reasonable magistrate could have concluded that Shirk's identification was reliable and that there was probable cause. It was omitted that other eyewitnesses, including Contreras standing next there, had been shown Heather's and Mark's DMV photographs, but had failed to identify  But was there any reason to doubt Shirk's veracity? Shirk was a citizen who looked on the Internet himself. Why should they doubt him? Well, they don't have to doubt his veracity, but as – but essentially what they need – what is essential is that – to look at whether he's – whether he's accurate. And as – and that's essentially what Gates says as well, and this Court said in Fuller v. M.G. Jewelry. Merely because the citizen witnesses are presumptively reliable, officers still had a duty to examine further based on the witness's knowledge. And there's numerous things that were omitted. As I said, other eyewitnesses didn't identify them. It's omitted that – that – that Shirk had testified that the woman had a full-face motorcycle helmet on. Your Honors, a full-face motorcycle helmet covers the forehead, it wraps around, it covers the chin. All that is visible is this oval, you know, in the face that I'm showing you. That was omitted. It was omitted that Shirk's opportunity to view the witness was very brief, just a few seconds as she moved away. It was omitted from even describing the website photograph at the record at 857 that he utilized in which there are five women who look very similar, particularly just in that particular oval of the face that's – that's available. And it's omitted that Shirk said that lightning – lighting conditions were dark and that Shirk's friends had been drinking. Very briefly, I'm going to turn to, you know, with respect to the DA, as you have pointed out, that the fact that the – that the district court was referring to a November 10th meeting when, in fact, there was a November 8th meeting. At that point, on November 8th, a telephone conversation that Fleming was – just gave his advice. He gave no – the record is very clear. He did not state that he was going to be charging a criminal complaint. That didn't happen until two days later. There's no basis for absolute immunity. And similarly, there's no basis for qualified immunity because, based on the limited information that Fleming had, he would not have believed that there was sufficient evidence to arrest for – for murder. I'll save the remaining of my time for rebuttal. Shirley. May it please the court. Shelly Green on behalf of the city defendants. And I will be trying to limit from 10 minutes or less so that I can turn it over to the – Mr. Moorish, who's representing the county defendants. First of all, I would like to say that the city defendants feel this appeal should be denied. We're talking about a murder here. Detectives who had a lot of experience were on it trying to solve this murder. And if all of what had happened hadn't happened and it was the wrong people, if we had looked back and it was the right people, it would have been excellent police work. Unfortunately, it didn't turn out that way. And it's in unfortunate circumstances, and we acknowledge that. I'd like to touch on a few points that Mr. Gross raised about Mark being arrested for murder. Mark had also been arrested for gun, drug, and child endangerment charges. And the probable cause is an objective standard. It is a policy or a practice of the district attorney's office that when they're investigating a homicide, they always consult with the district attorney before they charge murder because there may be further investigation. Before you arrest for murder, is that how you're using charge? Well, no. The police department will consult with the DA, and the DA will tell them whether or not, yes, to charge them with murder. My question is, do you mean before they arrest somebody for murder, they check with the DA? Yes. Yes, they generally will go over the information with the DA, what they have as part of their investigation. And so here they gave Fleming, on the 8th, they laid out on the table everything that they knew up until that point, apparently. Yes. Fleming didn't know anything about the case at that point, except, I guess, what he'd see in the newspaper. What he'd see in the newspaper, correct. And Fleming says, add book. That is, just charge these guys with murder. Correct. What's the basis for that? And I'm having a lot of trouble understanding, A, how there could be any immunity for that, and I just don't quite understand the basis for just flinging out a fine super, go charge these folks. Are you speaking of immunity for Fleming or immunity for my officers? Sorry? Are you speaking of immunity, have you found any immunity for Fleming? You're getting too close to that. I'm just having a hard time. I'm picking up. Oh, okay. People always say that about my voice. Back? Is that better? Maybe. Okay. Are you asking me about the immunity for the officers or immunity for Fleming? No, at the moment, I'm asking you about the immunity for Fleming. Oh, okay. I'm not representing Fleming. I'm sorry, okay, that's county. I'm sorry, I apologize. Mr. Morris is representing Fleming. Well, you say, I mean, I guess from the point of view of the officers, they call up, they lay out what's on the table and have some concerns themselves. And so they're relying on his, okay. Is that the heart of the qualified immunity? Yes, basically, what they- He doesn't, he never says to them that they've got probable cause to arrest either one of them. You just infer that from his statement to go ahead and pencil in some more charges? Well, that's what, they were already in jail for the gun, drug, and child endangerment charges. And when he goes over, you know, with the- Well, does that make any difference? That they were already in jail? I mean, they were on their way out of jail. Well, at least- And evidently, the whole purpose of adding to the booking was to keep them in jail for a few extra days. Right, because he was going, he indicated to Detective Reyes that he was going to file a criminal complaint. Well, maybe he did or maybe he didn't. I mean, who knows? Well, it is in the record. Well, I know this. It's both in the record. I mean, he at one point says, well, I don't remember ever talking to him before the 10th. And then, well, maybe I did. And then he does go on to say, I indicated to them that I'd go ahead and add the charges so that they don't bail out and then we have to re-arrest them. So he does talk about that, which is kind of consistent with what the detectives remembered. But the issue between Mark and Heather is different as well because with Mark, as the court discussed earlier, there had been the maglite with the blood, which at the time, it hadn't been tested. So the detectives, it was a pink fiber and it sort of had run and it looked kind of like blood. But it turned out that it wasn't. But there was the Harleys and the Just Brothers clothing. There were knives found. And there had been a weak identification of him. With Heather, it was a little different because she had been identified. There was such a strong identification by Brian Shirk. And she had been identified as the female who had left the scene with the perpetrators. And three witnesses had identified her through a photo lineup that afternoon. As to what? As to having been present at the scene. Yeah, okay. Well, there were a whole bunch of people present at the scene. So just saying, okay, I saw her there, what crime does that connote? Well, at this point, she at least, I mean, had looked. She had called over the perpetrator. The female had called the perpetrator over. And the perpetrator had killed Mark Donohue. And then she had jumped on a motorcycle and had left with the perpetrator. She hadn't, like. But she knows that she was what? Some kind of accessory or? Yeah, I mean, well, the DA thought that she was. Deputy DA Mayo testified that she at that point, both Mark and Heather, could most likely have gone through at least a preliminary hearing on that and been held to answer. But that's after the fact. I mean, that isn't what we knew at the time that this was going on. But the three witnesses was the bartender and Brian Shirk and then the contrarist who identified her from a photo line as being the female. So it wasn't that we just had this female that was there. People were saying that that was the female who was with the perpetrators who had gone on the motorcycle. Again, I'm just questioning, what exactly is it about being there or being with them or being married to one or being a close friend of the perpetrator or any of those things that's the crime? What's the crime? Well, at the minimum, an accomplice to the crime. And Heather... Everybody who was there? Well, no, she left with the perpetrators, Your Honor. That makes her an accomplice. Well, because she didn't, I mean, it was all over the papers. It was a really big deal. She wasn't calling the police and saying, I have some information to tell you. You know, she wasn't, like, you know, contacting anybody that we knew of. She wasn't saying anything about it. So we were looking for her. And actually, that was the basis of the search warrant, was that once we had an identification with her, which is a rather unique how Brian Shirk had gone on to the website to look for one of the males and then identified her. And he was so absolutely positive he had the right person that the... And then when Detective Reyes took the pictures to a gang expert from the DA's office, he knew that he knew about some motorcycle groups. And he was the one who identified Heather and that her husband was the vice president of the Just Brothers. As to the judicial deception, I'd like to just move on to that for a minute. The court did excise the criminal history. And also that part about... Totally astonishingly reckless, isn't it? Well, the court found that it was at least negligent. The way it's worded in the search warrant, I will concede, the way it is worded in the search warrant, it could have been worded better. I wouldn't say it rises to being untruthful, but it could have been clear. But the materiality, I just want to point out to the court, materiality of the information that's in the search warrant is to be determined by the judge. And there was no doubt, as to Shirk, there was no reason to doubt his veracity. He was standing right there. He saw the whole thing happen. And the appellants point out that the full-face helmet, that that was not listed in the affidavit. It is in the affidavit. And it's included in there, the description of her. And the, that he looked, when he looked at the picture, he recognized the look, and that was the same look he had seen the night before. This was a search warrant. There was logical and reasonable interpretation to move forward with the search. I'm beyond my five minutes. I'm going to turn it over to Mr. Morish. Thank you. I'll submit it on that notice. Good morning. May it please the Court. Jason Morish, Deputy County Counsel for the County of San Joaquin. Attorneys for the district attorney appellees in this instance. I believe that the district attorney brief adequately addresses most of the issues relative to absolute immunity in this instance. I'm having just a lot of trouble with the qualified immunity, with the absolute immunity point, because assuming he talked to them on the 8th, which he had obviously did, he wasn't at that point acting as an officer of the court in any sense. Was he? Was he? I would respectfully disagree with you. Well, I'm sure you do. But why? I mean, what basis is there for making that? Your Honor, under the functionality approach that this Court embraces under Embler, his function at that point was to make a charging decision. He didn't instruct anyone to arrest anyone. He considered the advice. I'm sorry. He said add book. I mean, that is add the murder charges. Charge. Yes. Absolutely, Your Honor. It's a murder charge. It's a charging decision.  That's not a charging decision. That's go add arrest and arrest. Well, Your Honor. I'm talking about filing a complaint or going to a, I don't know what other procedures are available in the State of California, but certainly, I mean, filing a complaint initiates, sets off in motion a court proceeding. That's obviously covered. But he didn't do that on the 8th. Your Honor, I think in this instance that that is a distinction without a difference. The reason being. Why doesn't the distinction make a difference? That is, at one moment in time, he's acting in his judicial prosecutorial mode, and prior to that, he's acting as a lawyer, giving legal advice to the police department about when they can arrest somebody or can't. Well, Your Honor, I believe during the Pellants argument, they actually conceded that no advice was given in this instance. And in fact, none was. He didn't give advice about probable cause in terms, at least so far as we know. He just said, go add on to the booking murder charges. Exactly, Your Honor. So we can keep these folks in jail for another two or three days. Well, Your Honor. Which strikes me as whether it's legal advice or just, well, I don't know. But that was what he said. Well, Your Honor, what I can tell you in this instance, I think, is what it wasn't. It was not investigative and it was not prospective. And you indicated he was acting as a lawyer. Exactly. He was acting as an advocate, as a prosecutor. That was the first step of a prospective legal proceeding. The decision to charge an individual with murder is, it goes to the very core of a prosecutor's duties. To suggest otherwise, to me, would be, well, it would be absurd. This is the type of action that is intimately associated with the judicial process. He didn't advise the police that they needed more. How is what he did exactly the same thing or at least indistinguishable from the advice that the prosecutor gave in Burns v. Reed, the U.S. Supreme Court case? I mean, he's telling the police something. That's that in Burns Hall, that isn't intimately connected with the judicial process. Your Honor, the distinction in that instance, I believe, and Burns makes it very clear, there is a reference to prospective advice, prospective legal advice. I don't think so. I don't think Burns makes. I think that's yours. No, Your Honor. With all due respect, and it is in the brief, I could give you the exact site if I pulled up the paperwork, but it does, in fact, refer to prospective legal advice. And that's the whole point here, Your Honor. If he's acting as an investigator, if he's going out and suggesting to people, police, you need to go get me more evidence, which is what happened in Reed. They came to him and said, hey, can we put this woman under hypnosis? But in the Supreme Court, didn't they hold that Reed's advice that the police had probable cause to arrest was not protected by absolute immunity? Now, that, regardless of whether they said he was an investigator or his role was investigated at one time or another, didn't they specifically say in Burns that his advice about probable cause to the cops was not protected by absolute immunity? Yes, Your Honor. That was the conclusion. Doesn't that decide this case? No, Your Honor. Absolutely not, because the facts are completely distinguishable. In Burns v. Reed, you're talking about an individual who was not in custody, who had not yet been arrested. In this instance. It makes a huge difference. So somebody's arrested for some diddly-squat offense. Maybe he got a bunch of traffic tickets out there. And for whatever the reason, somebody in the DA's office says, oh, I'd like to keep him in for a while, so let's just go add some murder charges. So that will guarantee they can't get out of jail while we're pending the little charges. I mean. Your Honor, I'm actually, I've exceeded my time. May I answer? Please. Your Honor, it's well settled with respect to absolute immunity that occasions of abuse will take place. The whole policy behind absolute immunity is to cloak prosecutors with a shield from these kinds of suits so that they can make the appropriate decisions without fear of legal recrimination. I'm okay with his filing the complaint. That's obviously protected. But that did not occur until after further discussion and two days later. It didn't occur. I don't know in his head he may have said, you know what, I'm going to be a cowboy and go out here and file these charges as soon as I get a, you know, a thought about it some more. Meanwhile, keep him in jail. That's the way it looks. Absolutely, Your Honor. And the fact that it appears that. What's judicial about that? The judicial aspect is his evaluation of the evidence based on what was presented to him by the police. No individual investigation. No instruction to the contrary. His professional evaluation of the evidence as presented by the police as stated in Buckley. And from that, he decided to pursue a murder charge. Okay. Let me isolate it just a little bit. Let's put aside the fact that he filed a complaint two days later. Do you contend that judicial immunity, that absolute immunity, excuse me, attaches to his statement to the police officers to go add Buck murder charges? Yes, Your Honor. Because? Because, Your Honor, the statement to add Buck is an initiation of a judicial prosecution. He is pursuing a murder charge in his professional position. Every time a DA gives advice about probable cause to arrest, you're saying that that is the initiation of legal proceedings? Do all the other rights attach to that? Are you sure that's the position that the government wants to take? Your Honor, I'm confident that it's not in every single instance. Absolutely not, Your Honor. Again, in this case, there is a very important distinction. The Ewings were already in custody. They had already been arrested. They were never arrested for murder. They were arrested on gun and drug charges, which is undisputed. And after the fact, after the police consulted with the district attorney and provided him with investigation, with the results of their investigation, he considered that evidence and said, add a murder charge. That's the prosecutor's job, to suggest otherwise endangers ever adding a murder charge after people who are already in custody. Do you say it's a different case if they were in jail and out of jail? If he says charge somebody with murder, you've got probable cause to charge. It's a different case as to immunity if the person is already in jail on something rather than if he was out? Yes, Your Honor, because in that instance, much like the circumstance that you pointed out in Burns v. Reed, you would have a prosecutor acting in an investigatory fashion. Hey, you've got enough to go out and make that arrest. That never happened here. That never occurred. Again, my time is well exceeded. Any further questions? We've used it up for you, and we'll give Mr. Gross a little extra time if he needs it. Thank you, Your Honor. As to the city, the city basically said there were three witnesses that then identified Mr. Shirk after, you know, at the station. Well, one of those, I'm sorry, three witnesses that identified Heather at the station afterwards. One of those was Shirk. It's not any different. You know, the other two, they were very suggestive ideas. Both of them said, oh, yeah, I saw Heather in the waiting room outside, and then they identified her. You know, clearly under Simmons, that's a suggestive procedure. Basically, the city just said that Heather, that there's evidence that Heather was an accomplice because she left the scene. You know, with basically under California law, under People v. Plengan's trip, if I pronounce that correctly, leaving the scene is not evidence of aiding and abetting. Now, on the judicial deception point, it is corrected, you know, that there isn't reason to doubt Shirk's veracity, you know, under Illinois v. Gates. But the real issue is whether if all of the evidence, the omissions had been read back into the affidavit, there's reasons to doubt or whether, you know, any magistrate would have found probable cause to believe that it was accurate. And we submit that it was not. I mean, again, I encourage the Court to look at page 857 and the photograph, which was not shown or was not described, which, you know, it's very difficult to say that looking at that narrow window would be sufficient to identify them. If the Court has any, well, with respect to what the district court said, Burns himself was in custody at the time. And, in fact, that the district attorney, the prosecutor there, filed a complaint one day later, but yet the Supreme Court said there was no absolute immunity for the instruction to the police to arrest him for probable cause, as Judge Edelman had pointed out. The basic for the claim against Phillips is essential. You could hold on one second. The basic for the claim against Phillips is basically that the district court claimed that the district attorney offices have no Monell liability because the district attorney represents the State. But the law is very clear that district attorney's offices are State officials only when performing prosecutorial functions. Scalia. Assuming there's Monell, what's the policy that injured your client? Assuming there would be Monell liability, what would be the policy? Well, that was an issue that wasn't addressed or wasn't brought out by law. But it's basically, if there is a policy, you know, basically there's a policy of instruction and directing, and the city then is definitely going to follow that of what happens, you know, even without probable cause. That is a policy under Monell. You know, we haven't had the full discovery on that issue, Your Honor. Okay. And one of the issues, I mean, another issue with respect to the DA's liability, you know, the evidence clearly shows that as of November 8th, it wasn't decided that there was going to be a criminal complaint filed. In fact, at the November 10th meeting, the evidence, the meeting was called just for that purpose, to determine whether a criminal complaint should be filed charging the Ewings with murder. And at that point, one of the DAs, Mayo, says, we shouldn't do it. And there's actually a fight within the office where Fleming says, if you don't have the balls to file a complaint against them for murder, then I will, and then go. And that's when it gets filed at that point. And so clearly that on November 8th, a decision had not been made that they were going to be charged with murder. Well, it's a little fuzzy what happened when and who said what. Well, Judge, Deputy DA Mayo was very clear what he said. Yeah. Is there any reason to try the case and develop the record more clearly on exactly what Fleming said and when? Well, yes. Clearly, I mean, we think that there is sufficient evidence, but we certainly would like the opportunity to go back and flesh it out even more, given the arguments that they've made in their appellate briefs, which aren't so clear. Well, is that what you're asking? Are you asking for it to go to trial? Are you asking for it to go to trial? Well, we had considered filing. So it's not a matter of immunity, it's a matter of law. Well, we would be very happy we would be very happy if the Court would find that there is no absolute immunity as a matter of law. We think it can on this record. I think that's why a number of times throughout this that I did emphasize that some of these facts here are undisputed, even though all we have to show is that they're We found that. What would you want us to do about qualified immunity? On qualified immunity, I don't think the Court can make that determination, you know, here at the present time. That would be an issue for trial. Okay. If there are any more questions, then I submit on behalf of the plaintiffs and appellants. Thank you, Your Honor. Okay. Thank you, Mr. Brooks. Thank you, counsel. The matter just argued will be submitted and the Court will stand in recess for the day.
judges: Adelman, Rymer, Tashima, Hall, Fletcher W. , Paez